UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| LAURENCE ROSANSKY, RONALD ROSANSKY, CHERYL RICHIUTTI, JONATHAN JAGID, JEFFREY JAGID, and JOSHUA JAGID, | ) ) ) ) ) ) |  |
| Plaintiffs, | ) ) |  |
| v. | ) ) | Action No. |
| PAUL ZIMBONE and CAROL GREGORY, Individually and as Trustee of each of The Gregory Revocable Trust, The Gregory Family Trust, and the Carol Jean Gregory Surviving Grantor's Trust, | ) ) ) ) ) ) ) |  |
| Defendants, | ) ) |  |
| and | ) ) |  |
| BIGCAMP, LLC, | ) ) |  |
| Nominal Defendant. | ) ) |  |

## VERIFIED COMPLAINT

Plaintiffs Laurence Rosansky, Ronald Rosansky, Cheryl Richiutti, Jonathan Jagid, Jeffrey Jagid, and Joshua Jagid (collectively, "Plaintiffs") bring this Verified Complaint against Defendants Paul Zimbone and Carol Gregory, Individually and as Trustee of each of The Gregory Revocable Trust, The Gregory Family Trust, and the Carol Jean Gregory Surviving Grantor's Trust ("Mrs. Gregory") (collectively, "Defendants"), and state as follows:

## INTRODUCTION

1. This is an action for damages, a declaratory judgment and injunctive relief to

confirm and enforce certain corporate actions taken by the Plaintiffs, who have voting control of Nominal Defendant BigCamp, LLC ("BigCamp" or the "Company"). Those actions include, without limitation, the removal of Defendant Paul Zimbone ("Zimbone") as Manager of the Company and the appointment of Plaintiffs Laurence Rosansky and Jonathan Jagid as new Managers. Zimbone, a minority interest holder in BigCamp, refuses to transfer control of the Company. Such refusal jeopardizes the Company's ability to function and carry out necessary corporate business. Zimbone's conduct also constitutes a breach of his fiduciary duties to his fellow members, as he has impaired their rights as BigCamp members.

## PARTIES

2. Plaintiff Laurence Rosansky is an individual residing in Sarasota, Florida.

3. Plaintiff Ronald Rosansky is an individual residing in New York, New York.

4. Plaintiff Cheryl Richiutti is an individual residing in Bellport, New York.

5. Plaintiff Jonathan Jagid is an individual residing in Miami, Florida.

6. Plaintiff Jeffrey Jagid is an individual residing in Demarest, New Jersey.

7. Plaintiff Joshua Jagid is an individual residing in Demarest, New Jersey.

8. Defendant Paul Zimbone ("Zimbone") is an individual residing, on information and belief, at 9 Blue Herron Drive, Cuttyhunk Island, Dukes County, Massachusetts.

9. Defendant Carol Gregory is an individual residing, on information and belief, in Port Aransas, Texas.

10. Nominal Defendant BigCamp, LLC ("BigCamp" or the "Company") is a Massachusetts limited liability company with a principal place of business in Raynham, Massachusetts.

## JURISDICTION AND VENUE

11. This Court has personal jurisdiction over Defendant Zimbone pursuant to G.L. c. 223A, § 2 because he resides in Massachusetts and, until his removal earlier this year, he acted as Manager of the Company, a Massachusetts LLC whose principal asset is a commercial building in Massachusetts.

12. This Court has personal jurisdiction over Defendant Gregory pursuant to G.L. c. 223A, § 3 because she owns a financial interest in the Company, whose sole business is the management and possession of real property located in Massachusetts, and claims to have exercised rights as a purported member of the Company.

13. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between the parties. In addition, the amount in controversy exceeds $75,000, as this matter concerns the rights to control the disposition and use of BigCamp's sole asset, a commercial building with a fair market value in excess of $4,000,000.

14. Venue is proper in this Division of this District under 28 U.S.C. § 1391(b)(2) because the property that is the subject of the action is situated within this District and a substantial part of the events giving rise to the claims asserted herein occurred in this District.

15. This action is also before the Court pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

## FACTS

*Formation and Early Years of BigCamp*

16. In or about 1996, Zimbone, Charles Gregory ("Gregory"), Bruce Jagid ("Bruce"), Martin Rosansky ("Martin"), and George Lane ("Lane") formed BigCamp.

17. BigCamp was formed to hold and develop a 36,500 square foot commercial real

estate building at 475 Paramount Drive in Raynham, Massachusetts (the "Property"). At all relevant times, the Property, the land on which it sits, and the proceeds derived therefrom, have been BigCamp's sole assets.

18. On or about April 8, 1997, Zimbone, Gregory, Bruce, Martin, and Lane executed an Operating Agreement for BigCamp (referred to herein as the "OA"). A true and correct copy of the OA is attached hereto as **Exhibit A**.

19. Pursuant to Schedule A of the OA, at the time of BigCamp's formation, Zimbone held a 30% interest in BigCamp, Gregory held a 20% interest, and Bruce, Martin, and Lane each held a 16.67% interest. All interests had voting rights.

20. The OA named Zimbone as the sole Manager. See Ex. A, § 6.14. As Manager, Zimbone was responsible for the management of BigCamp's business and affairs, including, but not limited to, management of the Property, maintenance of BigCamp's books and records (including maintaining a current list of the members of the LLC), and provision of financial statements to Members.

21. Section 7.2 of the OA permits a Member to transfer his interest in BigCamp to someone other than an immediate family member if the transferring Member obtains the express written consent of a majority of the LLC Interests (a "Voting Majority"). In such circumstances, the transferee will be admitted as a Member.

22. Absent such consent, however, the transferee receives only a Financial Interest and is ineligible to become a Member. In that case, the transferring Member is not released from any obligations of Membership (such as the obligation to contribute capital), but remains "bound by" the terms of the OA. See Ex. A, § 7.2.

23. Section 7.3 of the OA expressly provides that the restrictions against transfers in

Section 7.2 do not apply to transfers to an immediate family member (including, among others, spouses and children), who instead are eligible to receive a fully-voting LLC Interest and to become Members without the consent of any other Member.

24. Consistent with the Massachusetts Limited Liability Company Act, G.L. c. 156C, § 39(b)(2), which provides that a member of an LLC loses the power to exercise any of the rights of membership upon assignment of his LLC interest, Section 7.2 of the OA does not provide for retention of voting rights by a Member who transfers his LLC Interest without the requisite consent.

25. The OA provides that a Voting Majority is required to approve any corporate action (including amendment of the OA), see Ex. A, § 6.8, which action may be taken either at a properly noticed meeting or through a written consent signed by a Voting Majority.

26. In 1999, Martin assigned his economic interest in BigCamp to his three children Laurence Rosansky, Ronald Rosansky, and Cheryl Richiutti (the Rosansky children are collectively referred to herein as the "Rosanskys"). Since at least the early 2010s, however, Martin ceded his rights to his children, and since then, all the other Members, including Zimbone as Manager, have treated the Rosanskys (i.e. the children) as Members with full voting rights (5.56% each). Indeed, before this dispute, Zimbone has specifically requested the Rosanskys' participation in all corporate matters put to a vote.

27. Similarly, in 1999, Bruce assigned his economic interest in BigCamp to his three children, Jonathan, Jeffrey, and Joshua Jagid (the Jagid children are collectively referred to herein as the "Jagids"). Following Bruce's death after a long illness in 2001, the Members have similarly treated the Jagids as Members with full voting rights (5.56% each) and, prior to this dispute, Zimbone has similarly requested the Jagids' participation in all corporate matters put to a vote since Bruce's passing nearly twenty years ago.

28. Since Bruce's death in 2001, no Member ever questioned that Bruce's voting interest in BigCamp had passed to his children.

29. Despite Zimbone's obligation as Manager to have maintained an up-to-date list of BigCamp's Members, see Ex. A, § 8.1(a), Zimbone himself did not raise any question with the other Members as to whether the Jagids became Members on their father's death, nor did he request that formal documents be prepared to memorialize their becoming Members at that time. Nor did Zimbone, as Manager, ever insist that Martin execute a formal proxy authorizing his children to vote on his behalf.

30. From the time of BigCamp's formation through this dispute, BigCamp has been represented by the same law firm. Counsel similarly never requested that any formal documents be prepared to acknowledge the voting rights of the Jagid children or the Rosansky children.

### *Zimbone's Concealment of the Tenant's Financial Distress*

31. In or about February 2015, the Property's sole tenant, Medrobotics Corp. ("Medrobotics"), entered into a long-term lease intended to run through 2022.

32. In May of 2017, Medrobotics failed to make the monthly rent payment required under the lease, and was unable to make up the payment until September 2017, four months later. Zimbone took no action with Medrobotics and did not disclose the default to the Plaintiffs or the other Members.

33. In 2018 and 2019, when the Plaintiffs expressed a desire to sell the Property, Zimbone realized he had to convince Gregory and Lane to vote to keep it: if a decision was made to sell the building, the Members would learn that Medrobotics had missed a rent payment and that, as a result, the Property was significantly devalued so long as Medrobotics remained as tenant. This would have left Zimbone in the unenviable position of having to explain why he had not disclosed

Medrobotics' defaults to the other Members and would likely have cost him — at the very least — his role as Manager.  Only by continuing to conceal Medrobotics' situation could Zimbone be sure of the continued support of Lane and Gregory that he needed to maintain control of BigCamp.  As the Members would learn much later, the situation that Zimbone was concealing was far worse than the missed rent payment in 2017.

34.     By April 2020, Medrobotics had fallen so far behind that, for the first time in years, BigCamp was unable to make a quarterly distribution to the Members.  When the Members requested an explanation for the unpaid first quarter distribution, Zimbone had to admit that Medrobotics was deeply in default.  Although current on the monthly rent, Medrobotics had, beginning in 2018, completely stopped paying BigCamp's real estate taxes.  By early 2020, Medrobotics had missed at least the last six quarterly tax payments.

35.     As a result, by April, BigCamp was faced with a tax deficiency of approximately $150,000, and the Town was preparing to put a tax lien on the Property.  Zimbone told the Members that BigCamp had had to pay a portion of the outstanding taxes in order to avoid that lien, and the remaining amount of unpaid taxes was accruing interest and penalties.

36.     Zimbone claimed to have just become aware of Medrobotics' decision nearly two years earlier to cease paying the building's taxes while continuing to make the monthly rent payments.  Zimbone inexplicably argued against taking any action, stating that "Medrobotics has been a good customer of ours for over 8 years! They have been honest with us throughout this."

37.     In July 2020, Medrobotics also stopped making its monthly rent payments, yet Zimbone continued to argue against pursuing an eviction.  Jeffrey Jagid then requested that Zimbone provide the other Members with BigCamp's bank records, which led to the Rosanskys and the Jagids discovering that Zimbone had been aware of Medrobotics' cash problems as early as

7

2017, when it first fell behind in rent.

38. Despite requests from Members and a clear requirement in the OA, Zimbone never provided the Members with any annual financial statements.

39. In June and early August 2020, Laurence Rosansky called for a meeting and a vote to replace Zimbone as Manager. Zimbone did not respond to either request.

*August 2020 Consent*

40. Instead, Zimbone attempted to strengthen his own position to ensure he would retain support of a Voting Majority. In August of 2020, Zimbone concluded that, under the OA, Bruce's voting rights had not passed to the Jagids upon his death. Zimbone somehow reached that conclusion despite that (i) Section 7.3 permits Members to transfer their membership to close relatives without the consent of any third party and does not distinguish between transfers made during a Member's lifetime and transfers made upon the Member's death; (ii) Zimbone, as Manager since 1997, had been the sole party responsible for maintaining a current list of Members but never before suggested that the OA required that the Jagids be denied Membership or that, following Bruce's death, they needed to complete any documentation in order for them to become Members and obtain voting rights; and (iii) for twenty years following Bruce's death, Zimbone and all other Members treated Bruce's sons as Members and requested their votes on all matters put to a vote.

41. To "remedy" this imagined shortcoming in the OA, on August 25, 2020, Zimbone, Gregory, and Lane – then a Voting Majority – executed a written consent that added a provision to the OA specifically addressing the transfer of voting rights upon the death of a Member. That written consent, entitled "Consent Action of Members in Lieu of Special Meeting," (hereafter, the "August Consent"), is attached hereto as **Exhibit B**.

42. The August Consent provides, in part: "[U]pon the death of a member holding LLC

Interests with the right to vote, . . . such rights, may only be transferred to a single person, either a predetermined designee or a designee chosen by the personal representative of the estate of the deceased member, *who has been approved by the remaining members*, or shall otherwise be divided among the remaining members" (emphasis added).

43. The August Consent resulted in the OA now providing three different regimes for transfers of LLC interests: lifetime transfers to close relatives, which required no consent, transfers to unrelated third parties, which required consent of a Voting Majority, and any transfer on a Member's death, which now required unanimous consent of the other Members.

44. The August Consent also ratified a $6,000 annual management fee that Zimbone had been paying himself for over twenty years without authorization of the Members, and removed the OA's provisions allowing a minority interest holder to call meetings or request an audit.

***Gregory's Death and Lane's Purported Assignment to Zimbone***

45. Gregory, who had been Zimbone's best friend for more than forty years, passed away suddenly on March 18, 2021.

46. Since Gregory's death, neither the Rosanskys nor the Jagids have been presented with, much less approved of, an individual to receive Gregory's voting rights as required by the August Consent. Gregory's voting rights, therefore: (i) are ineligible to be exercised because no one has been presented to the remaining Members for approval; or (ii) have been divided among the remaining Members for failure to make such presentation within a reasonable time.

47. On March 30, 2021, Lane executed a document called "Assignment of Membership Interest" in which he assigned his interest to Zimbone. A copy of that assignment is attached hereto as **Exhibit C** and referred to as the "Lane Assignment." Zimbone's acceptance of the assignment is dated April 1, 2021. Plaintiffs have been informed that the funds were transferred on that date.

9

48. Pursuant to Section 7.2 of the OA, in order for Lane's voting rights to pass to Zimbone, Lane was required to obtain the written consent of a Voting Majority (other than Lane) prior to assigning his interest. At the time of the Lane Assignment, the only Members with voting rights who could provide the required consent were Zimbone, the Rosanskys and the Jagids.

49. At that time, the Rosanskys and the Jagids, collectively, owned a greater percentage of the voting rights than Zimbone, irrespective of whether the Gregory votes had passed to the remaining Members or remained ineligible to be counted.

50. Neither the Rosanskys nor the Jagids — together holding 33% of the voting interest in BigCamp — consented to the Lane Assignment. With Zimbone holding only a 30% interest, the transfer lacked the consent of a Voting Majority and, pursuant to Section 7.2 of the OA, Zimbone only received Lane's Financial Interest in BigCamp as a result of the Lane Assignment. Zimbone did not receive any voting rights.

51. Pursuant to the Lane Assignment itself, Section 7.2 of the OA and Section 39(b)(2) of the Massachusetts Limited Liability Company Act, Lane did not retain any voting rights following the assignment of his interest to Zimbone.

52. As a result of the Lane Assignment, as of no later than April 1, 2021, the only eligible voting Members of BigCamp were Zimbone, the Rosanskys and the Jagids.[1]

53. As of no later than April 1, 2021, and at all times since then, the Rosanskys and

---

[1] Section 7.2 of the OA states that the transferee of an LLC interest without the required consent may not participate in the management or operation of the company. Therefore, Zimbone became ineligible to serve as Manager by accepting Lane's interest without Lane first obtaining the requisite consent. It is not necessary for the Court to reach this conclusion in order to grant Plaintiffs the requested declaratory relief. To the extent this Complaint alleges that Zimbone served as BigCamp's Manager subsequent to the Lane Assignment, it is in the alternative to their position that accepting the Lane Assignment without the requisite consent disqualified him from so serving.

Jagids, collectively, have owned a greater percentage of the voting interest in BigCamp than did Zimbone and accordingly held, and continue to hold, a Voting Majority.

*Lane and Zimbone's Attempt to Unilaterally Bestow Voting Rights on Gregory's Widow*

54. On March 31, 2021, Zimbone and Lane signed a written "Consent Action of Members in Lieu of Special Meeting" ("March 31 Consent"), in which they purported to recognize Gregory's widow, Carol Gregory ("Mrs. Gregory"), as the owner of Gregory's LLC Interest and as a new Member of BigCamp "with the full right to vote." A copy of the March 31 Consent is attached hereto as **Exhibit D**.

55. Mrs. Gregory also signed a similar document entitled "Acceptance of Assignment of Membership Interest" ("Gregory Acceptance") in which she purported to accept assignment of Gregory's interest, including the "full power to vote."

56. The March 31 Consent and the Gregory Acceptance are invalid and of no effect. The August Consent, which governed the transfer of Gregory's interest to Mrs. Gregory because it occurred upon his death, specifically made approval of the remaining Members a precondition to her becoming a member. Neither Mrs. Gregory nor Zimbone ever sought, much less received, the approval of the Jagids and the Rosanskys needed to allow Mrs. Gregory to become a Member.

57. On March 31, 2021, Zimbone and Mrs. Gregory signed a second document, entitled "Consent Action of Members and Managers." In that document, Zimbone and Mrs. Gregory purported to waive all restrictions on transfers of interests in BigCamp and purported to consent to the Lane Assignment. A copy of that document is attached hereto as **Exhibit E**.

58. As Mrs. Gregory was not a Member, her signature is meaningless, and Zimbone lacked the majority of Members required to consent to the Lane Assignment (and, a fortiori, to waive the consent requirement). Therefore, the document is invalid and of no legal effect.

11

*The Rosanskys and the Jagids Take Over Managerial Control of BigCamp*

59.     Although Gregory passed on March 18, 2021, Zimbone did not inform the Rosanskys or the Jagids of Gregory's passing until April 5.

60.     On April 7, Zimbone informed the Rosanskys and the Jagids that he had agreed to purchase Lane's interest and that the purchase had already been completed.

61.     On April 14, Jeffrey Jagid asked Zimbone to provide evidence of any other Member's consent to the Lane Assignment. Zimbone never provided such evidence.

62.     On or about April 22, 2021, Plaintiffs, via their counsel, informed BigCamp's counsel, Johnna Tierney, that absent the required consent for the Lane Assignment, Zimbone appeared to have lost voting control.

63.     On April 29, 2021, pursuant to Sections 6.11 and 6.14 of the OA, the Rosanskys and the Jagids executed a written consent entitled "Consent Action of Members in Lieu of Meeting." A true and correct copy of that document is attached hereto as **Exhibit F** and referred to herein as the "April 29 Consent."

64.     The April 29 Consent was signed by all of the Rosanskys and Jagids. In addition, although all Members had recognized the voting rights of the Rosansky and Jagid children for years, out of an abundance of caution, Martin Rosansky and the late Bruce Jagid's widow, Lilian Jagid, also signed the April 29 Consent.

65.     The April 29 Consent: (i) amended the OA to permit immediate family members of original Members to serve as a Manager; (ii) amended the OA to expand the number of Managers to two; (iii) removed Zimbone as Manager; and (iv) appointed Laurence Rosansky and Jonathan Jagid as the two new Managers.

66.     Meanwhile, having been tipped off that he had lost voting control by the April 14

email from Jeffrey Jagid and by Plaintiffs' counsel's telephone call to Attorney Tierney, Zimbone (at that point unaware that he had already been voted out as Manager) prepared a document entitled "Manager's Certificate and Ratification of Action." The Manager's Certificate, dated April 30, purported to undo the transfer restrictions in the August Consent. A copy of the Manager's Certificate is attached hereto as **Exhibit G**.

67. By April 30, Zimbone was no longer a Manager of BigCamp, but even if he were, there is nothing in the OA permitting amendment of the OA with the approval only of a Manager holding a minority voting interest (Zimbone), the holder of a Financial Interest not entitled to vote (Mrs. Gregory) and a former Member also not entitled to vote (Lane).

68. Mrs. Gregory's signature on the Manager's Certificate is a nullity, as she had no voting interest in BigCamp.

69. Lane's signature on the Manager's Certificate is similarly ineffective, as he had transferred his rights in BigCamp one month before. Indeed, he signed the Manager's Certificate only as a "former Member."

70. The new Managers, via counsel, sent a copy of the April 29 Consent to Attorney Tierney on May 3, 2021, along with a letter directing Zimbone to cease all activities as Manager and to cooperate and comply with all requests by the new Managers to transition all management responsibilities to them.

71. Attorney Tierney responded by letter in which she denied the enforceability of the August 2020 Consent (which on information and belief she herself had drafted) and the April 29 Consent, and Zimbone has refused to transfer control of BigCamp to the new Managers. Attorney Tierney, on information and belief due to her firm's longstanding relationship with Zimbone and her involvement in the documents, defended Zimbone's shameless attempt to disenfranchise the

Jagids and add Mrs. Gregory as a Member in direct contravention of the August Consent she herself had drafted.

72. Zimbone's refusal to recognize the new Managers' rights is jeopardizing BigCamp's ability to function and carry out necessary business. For example, in light of the ongoing dispute, the bank holding BigCamp's checking and savings accounts has refused to take a position regarding who has control of BigCamp, thereby effectively preventing either party from carrying out any financial transactions on behalf of the Company except to the extent necessary to preserve the Property.

73. Medrobotics is no longer operating at the Property, is subject to numerous pending lawsuits and ceased paying its electric bills, as a result of which the electric company issued a notice that the power would be turned off.

74. The new Managers cannot effectively make decisions with respect to the care and disposition of the Property while Zimbone refuses to recognize them as being in control.

## COUNT I
## DECLARATORY JUDGMENT

75. Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

76. An actual case or controversy exists between Plaintiffs and Defendants concerning the enforceability of various actions by the parties and whether Zimbone must be compelled to recognize the new Managers and cease acting on behalf of BigCamp. Justice requires that the Court resolve this dispute.

77. Plaintiffs are entitled to a declaration that: (i) the Jagids and the Rosanskys have had voting rights in BigCamp at all relevant times; (ii) as a result of the August 2020 Consent, the approval of the remaining Members was required for Mrs. Gregory to become a Member, which approval was neither sought nor received; (iii) Zimbone did not receive any voting rights as a result

of the Lane Assignment, and Lane did not retain any voting rights following that Assignment; (iv) both of the purported March 31 Consent Actions, as well as Mrs. Gregory's purported Acceptance of Assignment of her late husband's interest, are invalid and of no consequence; (v) the April 29 Consent is valid and enforceable and, therefore, Zimbone is no longer the Manager of BigCamp and Laurence Rosansky and Jonathan Jagid are the new Managers with all powers and duties set forth under the OA; and (vi) the April 30 purported Manager's Certificate is invalid and unenforceable.

## COUNT II
## BREACH OF FIDUCIARY DUTY

78. Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

79. As an owner of BigCamp, a closely held company, and as Manager of BigCamp until April 29, 2021, Zimbone owed a fiduciary duty of utmost good faith and loyalty to Plaintiffs as fellow Members of BigCamp.

80. Zimbone breached his fiduciary duty through the conduct described herein.

81. As a result of Zimbone's breach, Plaintiffs' rights as BigCamp Members, including but not limited to the rights to vote and affect the direction and strategy of the Company, have been materially impaired.

82. Zimbone's breach of fiduciary duty has also caused damages to the Plaintiffs in the form of a diminution of the value of their BigCamp interest, in an amount to be determined at trial.

83. Plaintiffs are also entitled to equitable and injunctive relief, in the nature described in Count I, to remedy this breach, including but not limited to an order compelling Zimbone to recognize and implement a transfer of control to the new Managers.

**WHEREFORE**, Plaintiffs Laurence Rosansky, Ronald Rosansky, Cheryl Richiutti, Jonathan Jagid, Jeffrey Jagid, and Joshua Jagid pray that the Court:

A. Enter judgment in their favor and against Defendants on all Counts of the Complaint;

B. Award damages, including interest, in an amount to be determined at trial;

C. Enter the declaratory relief set forth in Count I above and any other declaratory relief consistent therewith;

D. Enter an order compelling Defendants to abide by: (i) the April 29 Consent, including, without limitation, its removal of Zimbone as Manager and appointment of Laurence Rosansky and Jonathan Jagid; and (ii) take all steps necessary to transfer managerial control of BigCamp to the new Managers; and

E. Grant them such other and further relief as is just or appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury on all counts so triable.

Respectfully submitted,

LAURENCE ROSANSKY, RONALD ROSANSKY, CHERYL RICHIUTTI, JONATHAN JAGID, JEFFREY JAGID, and JOSHUA JAGID,

By their attorneys,

 /s/ David B. Mack
David B. Mack (BBO # 631108)
dmack@ocmlaw.net
Stephanie R. Parker (BBO #687610)
sparker@ocmlaw.net
O'Connor Carnathan and Mack LLC
67 South Bedford Street, Suite 400W
Burlington, MA 01803
Telephone:  781.359.9000
Facsimile:  781.359.9001

Dated:  July 26, 2021

## **Verification**

      I hereby certify, under the penalties of perjury, that I have read the above Complaint and that I believe that the facts stated therein are true and that no material facts have been omitted therefrom.

                                                                            _____

                                                                            Laurence Rosansky

Date:  July 26, 2021